**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| South Carolina Farm Bureau Mutual Insurance Company,<br><br>Plaintiff,<br><br>v.<br><br>MD Roofing and Coatings, LLC, d/b/a MD Roofing, Randall Dorenbos, and Ryan Massey,<br><br>Defendants. | ) | Civil Action No.:<br><br>**COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

COMES NOW, the Plaintiff, alleging and complaining of the Defendants as follows:

**INTRODUCTION**

1. This case begins with a sworn confession. Hayston Adkins, IV, an MD Roofing employee at the center of this saga, testified, under oath, that MD Roofing trained him to "paint the perfect picture" on homeowners' roofs—and that "if you can't find hail marks, you're going to create some hail marks. We need to get these off to the insurance company." **(Dep. of Hayston Adkins, IV (Sept. 8, 2025) ("Adkins IV Dep.") 43:1-4, 120:14-17.)**
2. When MD Roofing's own counsel asked whether he intentionally damaged roofs, Adkins IV answered: "Yes. I did it the way we were trained, the way everybody else does it." **(Adkins IV Dep. 120:1-2, 122:4-5)** That admission describes the operating method of a roofing enterprise—not an isolated mistake.
3. Since 2017, MD Roofing has used storm-driven door-to-door sales, minimally trained personnel, adjuster-facing claim advocacy, and insurance-funded roof replacements to generate revenue. Its own website represented that the company had completed more than

2,000 projects, while its owners acknowledged operations in South Carolina, North Carolina, and Georgia. **(Dep. of Randall A. Dorenbos (Sept. 8, 2025) ("Dorenbos Dep.") 43:9-25)**

4. The documented example at 943 Callant Drive is supported by Ring doorbell footage, the Farm Bureau adjuster's video, sworn testimony from the two men on the roof, Hayston Adkins III and Hayston Adkins IV, expert inspection findings, weather reports, and Farm Bureau's Special Investigations Unit.
5. Defendants' scheme targeted homeowners first and insurers second. Salespeople created urgency, supplied false storm dates, induced claims, prepared the roof for adjusters, and pursued payment for a roof that the evidence showed did not suffer the claimed hail damage.
6. This action seeks recovery for the money Farm Bureau paid and the broader harm caused by Defendants' coordinated conduct.

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff South Carolina Farm Bureau Mutual Insurance Company ("Farm Bureau") is a South Carolina corporation doing business throughout South Carolina, including Horry County.
8. Farm Bureau issued the policy covering 943 Callant Drive, which is subject to its declarations, terms, conditions, and exclusions and, to date, has paid all applicable coverage.
9. Defendant MD Roofing and Coatings, LLC, d/b/a MD Roofing ("MD Roofing"), is a South Carolina limited liability company that has operated since 2017 performing roofing

services, storm-restoration, insurance-claim submissions, and related business in South Carolina, North Carolina, and Georgia.

10. Upon information and belief, MD Roofing also operates under or through DBAs and related names, including MD Roofing and Windows, LLC, and MD Roofing and Solar.

11. Defendant Randall Dorenbos is a citizen and resident of Horry County, South Carolina.

12. Dorenbos and Massey co-founded MD Roofing in 2017 after they were terminated from Monarch Roofing.

13. Upon information and belief, following Dorenbos' and Massey's termination from Monarch Roofing, the partners were sued, *inter alia*, for filing false mechanics' liens and falsely claiming work had been completed when, in fact, it had not. *See Monarch Roofing, LLC v. Ryan Massey and Randy Dorenbos*, 2017-CP-26-04377 (Ct. Comm. Pleas Horry Cnty.).

14. Dorenbos owns 50% of MD Roofing, has served as its sales manager since formation, directs the sales operation, and personally profits from the company's insurance-funded work.

15. Defendant Ryan Massey is a citizen and resident of Horry County, South Carolina.

16. Massey co-founded MD Roofing with Dorenbos in 2017, owns the other 50% of the company, oversees production and installations, and controls material ordering, scheduling, and completion of roofing projects.

17. Massey and Dorenbos direct and profit from the enterprise alleged herein.

18. The majority of the events giving rise to this action occurred in Horry County, South Carolina.

19. Defendants reside, operate, transact business, solicit homeowners, and communicate with insurers in Horry County, South Carolina, and the conduct at 943 Callant occurred in Little River, Horry County.

20. This Court has jurisdiction over the subject matter and the parties. Farm Bureau pleads its federal RICO claims under 18 U.S.C. §§ 1961–1968 which provide original jurisdiction to the federal courts under the United States Constitution, Article III.

## FACTUAL BACKGROUND

21. Farm Bureau incorporates by reference all foregoing paragraphs as if fully set forth herein.

22. At all relevant times, Farm Bureau insured 943 Callant Drive, Little River, South Carolina ("943 Callant"), through homeowners' Policy No. HO 484752, which included a right of subrogation.

23. Jaimee Randall and Brandon Randall owned 943 Callant during the relevant period.

24. MD Roofing holds itself out as a roofing and storm-restoration company that inspects, repairs, replaces, and maintains residential roofs. As part of these services, MD Roofing holds itself out as a business that assists homeowners with insurance claims.

25. Assisting homeowners with filing insurance claims is such an integral part of MD Roofing's unconscionable and unlawful enterprise that its website specifically directs consumers on how to file an insurance claim using MD Roofing's assistance.

26. At all relevant times herein, the website, www.mdroofing.us, provides as follows:




27. Its website advertised storm-damage restoration, free storm-damage reports, and more than 50 years of combined experience working with insurance companies to assess damage and make repairs.

28. MD Roofing's model is claim chasing: salespeople identify storm reports or aging roofs, canvass neighborhoods, inspect roofs, falsify narratives of storm related damage, encourage homeowners to report claims, meet the insurer's adjuster, and pursue a full replacement.

29. MD Roofing's website stated that it had engaged in more than 2,000 projects since its 2017 founding, and its owners testified that the company operates in Myrtle Beach and Greenville and services additional areas in North Carolina and Georgia. **(Dorenbos Dep. 43:9-25)**

30. MD Roofing compensated sales personnel based on signed contracts, roofs sold, and insurance-funded work. Trainers received a percentage of trainee sales, and sales representatives were paid primarily for production rather than accurate damage assessment.

31. For example, as part of this incentive program, Adkins IV testified that the company ran sales competitions and incentives, including a trip to Key West, even though it did not impose a formal quota. **(Adkins IV Dep. 66:16-18)**

32. Although job duties did not change, MD Roofing moved its sales force from independent-contractor status to employee status for tax purposes and for no legitimate business purpose. This transition occurred around 2023, while the company continued to pay salespeople according to contracts signed and jobs sold.

33. MD Roofing touts its expertise, but hires individuals who have no training, no experience, and no knowledge of the industry.

34. MD Roofing hired Hayston Adkins IV despite his having zero roofing or construction experience. According to deposition testimony, Reed Brown recruited and trained him solely because Dorenbos observed Adkins IV's outgoing, well-spoken demeanor during an unrelated interaction at a Take 5 oil-change store. **(Dorenbos Dep. 101:11-16; Dep. of Randall Dorenbos as Rule 30(b)(6) Designee of MD Roofing (May 7, 2026) ("MD Roofing 30(b)(6) Dep.") 73:16-17, 146:19-23; Adkins IV Dep. 27:19-20, 35:5-6)** Adkins IV was then sent into neighborhoods to inspect roofs, speak with homeowners, and interact with insurance adjusters.

35. MD Roofing hired Hayston Adkins III with no formal interview, no background check, no references, and no relevant roofing experience. **(Dep. of Hayston Adkins, III (Sept. 8, 2025) ("Adkins III Dep.") 23:1-10)**

36. Dorenbos admitted that MD Roofing performs no official background checks on its employees and instead relies on personal impressions of whether applicants seem like decent people. **(MD Roofing 30(b)(6) Dep. 133:3-10)**

37. MD Roofing's training was, and still is, primarily informal and on-the-job, with no classroom sessions, written materials, evaluations, or competency tests before employees were sent to inspect roofs and interact with insurance adjusters. Employees described learning through coworkers, "shop talk," and field observation. **(Adkins III Dep. 23:21-25, 31:11-25; Adkins IV Dep. 46:3-9)**

38. Adkins III testified that he was unsure how to distinguish legitimate hail and wind damage. **(Adkins III Dep. 28:1-11, 34:19-25)**

39. Adkins IV, also an employee of MD Roofing at all relevant times herein, was hired with no roofing experience and was sent into the field with no meaningful training on property damage assessment, insurance claims, or other industry relevant and standard guidance to manufacture insurance claims.

40. Employees are instructed to "paint the picture," of a damaged roof for insurance claims.

41. Specifically, Adkins IV testified that MD Roofing trained him to "paint the perfect picture" on a roof: know the storm report, know the wind direction, know the hail size, learn what a particular adjuster preferred, and make sure enough collateral damage appeared on downspouts, gutters, and window screens to support the claim. **(Adkins IV Dep. 43:1-8, 45:14-24, 46:1-2)**

42. The "paint the picture" scheme consists of manually creating hail strikes or other storm damage if none are found on the shingles, roofing materials, gutters, downspouts, window screens, and other areas of a property to manufacture storm damage for purposes of submitting a false or exaggerated insurance claim.

43. Adkins IV testified: "if you can't find hail marks, you're going to create some hail marks. We need to get these off to the insurance company." **(Adkins IV Dep. 120:14-17)** He

explained that creating marks included making additional house strikes, marking or damaging gutters and downspouts, and putting holes in window screens so the collateral damage would look like a hail strike. **(Adkins IV Dep. 45:22-23, 120:18-25)**

44. Adkins IV testified that, consistent with his training, he would arrive one to two hours before the insurance adjuster to prepare the roof and "paint the picture." **(Adkins IV Dep. 122:7-8, 132:10-13, 144:17-18)**

45. MD Roofing taught its employees, including Adkins III and Adkins IV, how to create the 10-by-10 test-square evidence and collateral damage that adjusters would consider, and that field personnel were expected to make the roof appear to meet the insurer's threshold before the adjuster arrived.

46. In other words, if storm damage is not actually present or significant enough, MD Roofing employees are to use whatever means necessary to fabricate storm damage to a residence for the purpose of creating or enhancing an insurance claim.

47. At all relevant times, MD Roofing had no meaningful consumer-protection controls to prevent a salesperson from fabricating damage. Dorenbos admitted there was no second-person verification before the adjuster arrived, no routine site audit of sales inspections, and no written anti-fabrication policy—only what he called a "zero-tolerance policy that is not written down." **(MD Roofing 30(b)(6) Dep. 62:15-23, 99:10-19)**

48. MD Roofing did not require salespeople to hold roofing licenses, to hold HAAG certifications or HCI numbers, or to complete continuing education, and no employee was a licensed public adjuster as required by industry standards and/or the laws of the State of South Carolina.

49. Yet MD Roofing used an "Agreement to Negotiate Insurance Settlement" that authorized it to "act as an agent on Owner's behalf" and "negotiate the loss," and charged a 10% fee if it obtained insurance proceeds but did not receive the roofing job. **Exhibit A.**

50. These representations and activities were designed to place MD Roofing between homeowners and insurers while deliberately avoiding licensing requirements that govern public adjusting.

51. MD Roofing, Dorenbos, and Massey are aware, encourage, and train employees to use whatever means necessary to obtain additional funds on claims.

52. For example, MD Roofing was aware of a separate Greenville, South Carolina, incident involving then-employee AJ Galigher. Dorenbos testified that he personally witnessed Galigher take a photograph he said he would use to fabricate part of an insurance claim. **(MD Roofing 30(b)(6) Dep. 63:15-25, 65:9-14, 66:4-5)** The roof had already been approved, but Galigher was attempting to fabricate evidence to obtain additional funds.

53. MD Roofing had no formal complaint-handling policy despite BBB complaints and Google-review complaints regarding MD Roofing's poor business practices.

54. The absence of a documented complaint process, inspection audit, or written anti-fabrication rule left the company free to treat a documented fraud event as an individual employee problem rather than a systematic management or business practice failure.

55. Dorenbos and Massey are involved in related ventures, including MD Investments and Cobblecreek Builders. MD Roofing also used the trade name MD Roofing and Solar in claim communications and business records, demonstrating the overlapping names and operations through which the owners conducted roofing and related work.

56. MD Roofing also fails to follow industry standards on record keeping.

57. There is no surviving contract, inspection checklist, photograph, or CRM file for 943 Callant, and the company has no formal document-retention policy. The missing records are especially significant because they concern the very file in which the roof was prepared before the adjuster arrived.

***The Scheme at 943 Callant Drive***

58. The scheme at 943 Callant is an exemplar of the nefarious and illegal business practices of MD Roofing.
59. On October 18, 2023, Hayston Adkins IV, acting within the scope and course of his MD Roofing work, and pursuant to his employer's instructions, knocked on the door at 943 Callant.
60. Adkins IV told Brandon Randall that he was in the neighborhood repairing another roof and could see wind damage from the street.
61. After creating the ruse, Adkins IV then cited June 7, 2023, as the date of a hailstorm and obtained permission to inspect the roof. **Exhibit B.**
62. Adkins IV inspected only the front slope with Randall and immediately told him that the roof had obvious hail and wind damage and needed a full replacement.
63. The alleged hailstorm was also a lie to the homeowner to induce an insurance claim.
64. Randall did not know of any alleged roof damage until Adkins IV told him about it.
65. Adkins IV, continuing with standard MD Roofing business practices, instructed Randall to report the June 7, 2023 date of loss to Farm Bureau, told him insurance should pay, and directed him to notify MD Roofing before the adjuster arrived so Adkins IV could meet with the adjuster.

66. Randall then contacted Farm Bureau at Adkins IV's direction reporting the alleged damage as instructed by MD Roofing, and confirmed by text to Adkins IV that he had reported the claim as instructed.

67. MD Roofing knew that the claimed storm date was false.

68. The StormerSite Hail History Report generated for MD Roofing on October 18, 2023, showed no June 7, 2023, hail event at 943 Callant.

69. CoreLogic's Hail Verification Report likewise identified no hail event on the claimed date, and the CoreLogic Wind Verification Report did not establish a qualifying wind event close to the loss date. **Exhibit C.**

70. On October 24, 2023, Farm Bureau's adjuster, Colin Peavy, arrived for the scheduled inspection. He arrived before the 10:30 a.m. appointment and observed Adkins IV and Adkins III already on the roof.

71. The adjuster saw, and his video footage shows, Adkins IV and Adkins III lifting, swiping, digging into, bending, creasing, and tearing shingles, pushing or throwing a shingle from the roof, and creating the appearance of hail and wind damage before the adjuster inspected the property.

72. Jay Zettergren, another MD Roofing employee, was present at 943 Callant and observed the activity without directing either man to stop.

73. Both Adkins IV and Adkins III later confirmed, under oath, that what they did at 943 Callant was consistent with MD Roofing's training. **(Adkins IV Dep. 101:4-9, 102:3-6; Adkins III Dep. 53:20-25)** Adkins III testified that he had no instruction to preserve the roof or avoid altering it, and that the manner in which he inspected 943 Callant was the manner in which MD Roofing trained him. **(Adkins III Dep. 38:22-25, 53:20-25)**

74. Adkins IV testified that the conduct at 943 Callant was intentional in the sense that he was finding more hail than was really present to "paint the perfect picture." **(Adkins IV Dep. 43:1-8)** He testified that everything he did was done as he was trained by MD Roofing and that the same method was used by others. **(Adkins IV Dep. 122:4-8)**

75. Acting as previously trained by MD Roofing employees, and consistent with MD Roofing's business practices, Adkins III and Adkins IV arrived early—before the adjuster—and began creating damage.

76. This time, however, they were observed visually and caught on camera, lifting and creasing shingles to emulate wind damage, pushing or tossing a detached shingle off the roof, and creating and manufacturing hail damage.

Hayston Adkins , IV September 8, 2025
South Carolina Farm Bureau Mutual Insurance Company Vs. MD Roofing And Coatings LLC, Et Al.

Page 120

intentionally damage a roof.
A. Yes, I did.
Q. You intentionally damaged roofs?
A. Yes.
Q. Why did you intentionally damage roofs?
A. When you say "intentionally damage" a roof --
Q. Yes, sir.
A. I didn't go up there and decide to take shingles off the roof and destroy the entire roof. What I did do is exactly what MD Roofing trained us to do.
Q. And did MD Roofing --
A. Find some hail marks. If you can't find hail marks, you're going to create some hail marks. We need to get these off to the insurance company.

77. The video evidence shows the roof being manipulated before the adjuster's inspection, followed by an adjuster's contemporaneous observations and photographs. **Exhibit D.**

78. The conduct at 943 Callant matched the scheme Adkins IV described under oath: arrive before the adjuster, manipulate or mark the roof, add collateral indicators, and present the prepared roof as storm damage. **(Adkins IV Dep. 45:14-24, 120:14-17, 122:7-8)** Adkins III confirmed that the activity shown in the video was consistent with MD Roofing's training, and Jay Zettergren was present without stopping it. **(Adkins III Dep. 52:17-22, 53:24-25)**

Q. So you think this happened because the -- you think the incident at 943 Callant happened because MD Roofing did not properly train you on how to inspect roofs?
MR. CONNELL: Object to the form.
A. Yes.
Q. You didn't do anything on the roof at 943 Callant intentionally, did you?
A. Yes.
Q. You did intentionally?
A. Yes.
Q. Why did you do it intentionally?
A. Well, I will rephrase. Intentionally was when you're looking

Veritext Legal Solutions
800.743.DEPO (3376) calendar-carolinas@veritext.com www.veritext.com

Hayston Adkins , IV September 8, 2025
South Carolina Farm Bureau Mutual Insurance Company Vs. MD Roofing And Coatings LLC, Et Al.

Page 43

for the hail damage, you know, we're also -- I was trained to make sure that we're putting -- you know, find more hail than what's really there, called paint the perfect picture.
Q. So you were just doing what you were trained?
A. Everything I was doing I was doing as I was trained.
Q. So you acted as you were instructed?

79. AAA Roof Technologies inspected 943 Callant on November 2, 2023. Its report stated that it detected no evidence of hail damage using industry standards, identified 28 creased shingles and mechanical or foot-traffic damage, and concluded that the damaged areas did not display the typical characteristics of natural wind-lift damage and, therefore, were caused by unnatural occurrences.

80. Farm Bureau thereafter paid the claim and related repair amounts; the claims file reflects total dwelling payments of $13,599.21, including later completion and depreciation payments.

81. When Farm Bureau's SIU investigator confronted Dorenbos with the evidence and asked whether creasing and tearing shingles was a normal part of the inspection, Dorenbos stopped the recorded interview after approximately 19 minutes and directed the investigator to contact his attorney. **Exhibit E.**

## THE ENTERPRISE

82. Farm Bureau incorporates by reference all foregoing paragraphs as if fully set forth herein.

83. MD Roofing and Coatings, LLC is an "enterprise" within 18 U.S.C. § 1961(4). MD Roofing is a legal entity formed and operated as a going concern since at least 2017, with owners, managers, sales personnel, trainers, production personnel, offices, trade names, customer contracts, and recurring communications with homeowners and insurers.

84. Additionally, the RICO enterprise is an association-in-fact consisting of MD Roofing, Dorenbos, Massey, Chris Barringer, David Ballard, Reed Brown, Jay Zettergren, Hayston Adkins IV, Hayston Adkins III, and other employees, contractors, and agents known and unknown.

85. The association had a common purpose: obtain insurance-funded roofing work and insurance proceeds by manipulating the appearance and presentation of roof damage.

86. The enterprise had a recognizable hierarchy and division of labor. Dorenbos and Massey owned and managed the company; Dorenbos controlled sales and Massey controlled production. Barringer served as a sales manager from approximately 2021 through 2024, Ballard managed the Greenville branch, and Brown trained field salespeople. Adkins IV, Adkins III, Zettergren, and other field salespeople canvassed homeowners, inspected roofs, prepared claims, and interacted with adjusters.

    a. Management and ownership: Dorenbos and Massey personally directed the

enterprise, set compensation and training practices, controlled the sales and production functions, and received the profits generated by insurance-funded work.

b. Sales and branch management: Barringer and Ballard supervised sales personnel and field operations, including the process of scouting neighborhoods, contacting homeowners, presenting storm reports, and coordinating adjuster meetings.

c. Training and preparation: Brown trained Adkins IV and other salespeople in field inspection and adjuster-facing techniques, including the "paint the picture" method and the use of collateral damage to support claims.

d. Field execution: Adkins IV, Adkins III, Zettergren, and other salespeople executed the scheme by canvassing, inducing claims, altering roofs or claim evidence, arriving before adjusters, and communicating the prepared narrative to insurers.

87. The enterprise also operated through DBAs and related entities, including MD Roofing and Windows, LLC and MD Roofing and Solar, and maintained overlapping business relationships with the owners' other ventures.

88. Those names and entities were used in marketing, claim files, contracts, and roofing operations.

89. The enterprise exists separate and apart from the pattern of racketeering activity because it has an ongoing organization, hierarchy, workforce, compensation system, training system, customer-acquisition process, offices, trade names, and revenue-producing business independent of any single fraudulent claim.

90. The enterprise's activities affected interstate commerce. MD Roofing operated across South Carolina, North Carolina, and Georgia; used interstate mail, telephone, email, online

claim portals, weather-data services, CRM systems, vendors, and banking institutions; and sought insurance payments from insurers operating in interstate insurance markets.

## PATTERN OF RACKETEERING ACTIVITY

91. Farm Bureau incorporates by reference all foregoing paragraphs as if fully set forth herein.

92. Defendants engaged in a "pattern of racketeering activity" within 18 U.S.C. § 1961(5).

93. Upon information and belief, the acts began with MD Roofing's formation in 2017, continued through the 943 Callant claim in October 2023 and the ensuing investigation, and continued across more than 2,000 projects through the present in Horry County, Greenville County, and other locations in South Carolina, North Carolina, and Georgia.

94. The pattern was related and continuous.

95. Each act furthered the same purpose—convert manufactured or exaggerated property damage into insurance-funded roofing revenue—using the same participants, methods, victims, communications, compensation structure, and enterprise.

96. The enterprise also used the "Agreement to Negotiate Insurance Settlement" to secure a financial interest in insurance proceeds. The agreement authorized MD Roofing to act on the homeowner's behalf and negotiate the loss, while requiring a 10% fee if insurance money was obtained but MD Roofing did not receive the roofing work.

97. The agreement and the surrounding false expertise and fabricated damage representations placed economic pressure on homeowners and created an additional unlawful revenue stream from claims the enterprise induced or enhanced.

98. The predicate acts include mail fraud, wire fraud, insurance fraud, financial identity fraud and fraudulent schemes, obtaining property by false pretenses, and extortion under the

Hobbs Act, 18 U.S.C. § 1951, through efforts to obtain insurance-funded property and fees by coercive and fraudulent means.

a. Mail fraud, 18 U.S.C. § 1341: From at least 2017 through the present, MD Roofing and its agents used the U.S. mail to transmit fraudulent or misleading insurance claims, estimates, scope revisions, supplements, depreciation requests, payment follow-ups, and related claim materials to Farm Bureau and other insurers. The 943 Callant claim, including Farm Bureau's claim, estimate, investigation, and payment materials transmitted in October through December 2023, is a documented exemplar.

b. Wire fraud, 18 U.S.C. § 1343: From at least 2017 through the present, Defendants used interstate telephone calls, text messages, emails, online claim portals, CRM systems, storm-data services, and website communications to induce claims and transmit fraudulent estimates, supplements, scope revisions, and payment requests. Adkins IV coordinated with homeowners and adjusters by telephone and text, including the 943 Callant claim, and MD Roofing used its website to market storm-damage and insurance-claim services to homeowners.

c. Insurance fraud, S.C. Code Ann. § 38-55-540: On October 18 and October 24, 2023, Adkins IV, Adkins III, Zettergren, and MD Roofing presented, caused to be presented, or facilitated false, incomplete, and misleading information to Farm Bureau concerning hail and wind damage at 943 Callant, including the false June 7, 2023, loss date and the roof's manufactured condition in violation of the law, specifically including S.C. Code Ann. § 38-55-170. Upon information and belief, the same conduct occurred on numerous other claims.

d. Financial identity fraud and fraudulent schemes, S.C. Code Ann. § 16-13-420: Defendants used homeowners' policy information, claim numbers, property information, estimates, photographs, storm reports, and payment requests to create a scheme to defraud Farm Bureau and other insurers and to obtain insurance proceeds and roofing contracts to which the enterprise was not entitled.

e. False pretenses, S.C. Code Ann. § 16-13-240: Defendants obtained or attempted to obtain property and money by representing that roofs suffered covered storm damage when the damage was absent, insufficient, or manufactured. Farm Bureau's payment on the 943 Callant claim is the documented result; the Greenville Galigher incident and the more than 2,000 projects support the pattern and threat of repetition.

99. The state-law offenses alleged above are felonies punishable by imprisonment for more than one year and qualify as racketeering activity under 18 U.S.C. § 1961(1)(A). Mail and wire fraud qualify under 18 U.S.C. § 1961(1)(B), and the alleged extortionate efforts qualify under 18 U.S.C. § 1961(1)(B).

100. Each claim, estimate, scope revision, supplement, payment request, manufactured inspection, false storm-date representation, and insurance submission constituted a separate act or transaction in furtherance of the pattern. The participants acted knowingly, intentionally, and for the purpose of obtaining money and roofing work.

101. Upon information and belief, the scheme has been and is being repeated in Horry County and Greenville County and at other properties throughout South Carolina, North Carolina, and Georgia. The enterprise targets homeowners and insurers in each location

using the same storm-report, canvassing, roof-preparation, adjuster-meeting, and claim-submission process.

102. The pattern poses a threat of continued racketeering activity because the enterprise remains organized, the owners and managers remain capable of directing the same conduct, the company continues to solicit storm-restoration work, and its records identify more than 2,000 projects.

103. The conduct is therefore both closed-ended and open-ended under 18 U.S.C. § 1961(5).

## SPECIFIC ALLEGATIONS OF FRAUD

104. Farm Bureau incorporates by reference all foregoing paragraphs as if fully set forth herein.

105. Farm Bureau pleads the fraudulent acts with particularity under Federal Rule of Civil Procedure 9(b), identifying the who, what, when, where, and how of the documented exemplar and the repeated scheme.

***Who:***

106. Who: MD Roofing; owners and managers Randall Dorenbos and Ryan Massey; sales managers Chris Barringer and David Ballard; trainer Reed Brown; field employees Hayston Adkins IV, Hayston Adkins III, and Jay Zettergren; AJ Galigher in the Greenville incident; and other employees and agents known and unknown. Dorenbos and Massey directed the enterprise and profited from it; the managers and trainer supervised or instructed salespeople; and field personnel executed the roof and claim activity.

***What:***

107. What: Defendants manufactured, exaggerated, and presented roof damage as hail or wind damage; induced homeowners to report claims; supplied false storm dates; prepared roofs before adjusters arrived; created or highlighted test-square and collateral damage; and transmitted claims, estimates, supplements, scope revisions, photographs, payment requests, and related communications to insurers that were knowingly, intentionally, and deliberately false in whole or in part.

***When:***

108. When and where: The documented exemplar began on October 18, 2023, at 943 Callant Drive in Little River, continued when the Farm Bureau adjuster arrived on October 24, 2023, and was investigated through November 29, 2023. The broader pattern began no later than 2017 and continued through the present across Horry County, Greenville County, other South Carolina locations, North Carolina, and Georgia.

***How:***

109. How: The enterprise used a repeatable process designed to make insurers see damage that was absent, insufficient, or created after the homeowner was solicited.

a. Door-to-door canvassing: Salespeople used storm reports, hail-data applications, and neighborhood scouting to approach homeowners and offer free or purportedly objective storm-damage inspections.

b. False homeowner representations: Salespeople falsely represented to unknowing homeowners that roof damage was visible from the street, cited fake storm dates or hail sizes, promised insurance would pay, and urged a full roof replacement even when objective weather data or true property conditions did not support the representation.

c. Claim induction: Salespeople instructed homeowners to contact their insurers, supplied the loss date to report, and told them that their only responsibility would be the deductible, sometimes implying that MD Roofing could find ways around the deductible.

d. Pre-adjuster property preparation: Salespeople instructed homeowners to notify MD Roofing of the adjuster's appointment and then arrived one to two hours early to manipulate, mark, lift, crease, or otherwise create damage to the roof and collateral features.

e. Adjuster-facing narrative: Field personnel pointed out the prepared marks, test squares, gutters, downspouts, screens, and other indicators to the adjuster and used their knowledge of adjuster preferences to carry out the “paint the picture” scheme.

f. Claim submissions: MD Roofing and its agents transmitted estimates, photographs, supplements, scope revisions, depreciation requests, payment follow-ups, and other claim communications by mail and electronic means to Farm Bureau and other insurers.

g. Fee extraction: MD Roofing used the Agreement to Negotiate Insurance Settlement to obtain authority to act as the homeowner’s agent, negotiate the loss, and claim a 10% fee if insurance proceeds were obtained without a roofing contract.

h. Concealment and continuation: MD Roofing maintained no written anti-fabrication policy, no effective second-person verification, no routine site audits, and no complete 943 Callant file. After the investigation began, the company lost historical CRM data during the Job Progress-to-AccuLynx transition, and Dorenbos ended

the recorded interview when confronted with the roof video, reflecting attempts to obstruct or terminate the carrier's investigation.

i. Independent confirmation: AAA Roof Technologies found no hail damage and identified unnatural mechanical damage, while CoreLogic found no qualifying hail event on the claimed date. Farm Bureau's SIU reviewed the video, claim file, weather data, and expert report and concluded that MD Roofing employees manufactured the damage for the purpose of creating or exaggerating an insurance claim.

j. Additional exemplar: In Greenville, Dorenbos personally witnessed AJ Galigher fabricate claim evidence to obtain additional insurance funds after the roof had already been approved. That incident demonstrates that this conduct and scheme were not limited to 943 Callant.

**DIRECT INJURY TO PLAINTIFF'S BUSINESS AND PLAINTIFF'S INSURED'S PROPERTY**

110. Farm Bureau incorporates by reference all foregoing paragraphs as if fully set forth herein.

111. As a direct and proximate result of Defendants' conduct, Farm Bureau was injured in its business and property, including by paying insurance proceeds for damage manufactured or exaggerated by the enterprise, funding investigation and recovery efforts, addressing property damage caused during purported inspections, and diverting personnel and resources to uncovering and responding to the scheme.

a. Farm Bureau paid the 943 Callant claim based on a roof condition created or materially altered by Defendants, including the $12,872.16 manufactured loss identified and the $13,599.21 dwelling payment reflected in the claims file;

b. Investigative costs expended by Farm Bureau to uncover the fraudulent scheme;

c. Property damage inflicted upon insured properties by Defendants during their so-called "inspections";

d. Lost time and opportunity to earn income diverted to investigating and addressing Defendants' fraud; and

e. The ongoing and repeated nature of the fraud across over 2,000 projects since 2017, resulting in systemic financial harm to Plaintiff's insurance operations.

112. Farm Bureau's injuries were directly caused by and proximately resulted from Defendants' predicate acts.

113. But for Defendants' conduct, Farm Bureau would not have paid the manufactured loss or incurred the related investigative and response costs.

**<u>FOR A FIRST CAUSE OF ACTION</u>**
**Federal RICO - 18 U.S.C. § 1962(c)**
**(Conducting Enterprise Through Pattern of Racketeering Activity)**
**(Against All Defendants)**

114. Farm Bureau incorporates by reference all foregoing paragraphs as if fully set forth herein.

115. At all relevant times, the RICO Enterprise was an enterprise engaged in, and whose activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

116. Each Defendant is a "person" within 18 U.S.C. § 1961(3) and was employed by, associated with, or conducted the affairs of the RICO Enterprise. MD Roofing is the entity through which the individual Defendants organized, directed, and profited from the enterprise.

117. Dorenbos and Massey conducted and participated in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity. MD Roofing conducted the

enterprise's affairs through its managers, trainers, employees, agents, trade names, customer contracts, claim communications, and revenue systems.

118. The pattern consists of related predicate acts including mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, extortion under the Hobbs Act, and state-law felonies under S.C. Code Ann. §§ 16-13-240, 16-13-420, and 38-55-540. The acts shared the same purpose, participants, victims, methods, and results and were interrelated by distinctive characteristics.

119. The predicate acts were related because they used the same storm reports, canvassing scripts, false loss dates, pre-adjuster roof preparation, adjuster-facing presentations, insurance submissions, fee agreements, and payment requests. They targeted homeowners and insurers, including Farm Bureau, and were carried out by the same enterprise hierarchy.

120. The pattern poses a threat of continued racketeering activity. MD Roofing has operated since 2017, represented more than 2,000 projects, maintains the same ownership and operating structure, and continues to solicit storm-restoration and insurance-funded roofing work across multiple states.

121. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Farm Bureau was injured in its business and property as alleged above.

122. Pursuant to 18 U.S.C. § 1964(c), Farm Bureau is entitled to recover threefold the damages sustained, reasonable attorneys' fees, and costs of suit.

**<u>FOR A SECOND CAUSE OF ACTION</u>**
**Federal RICO - 18 U.S.C. § 1962(d)**
**(Conspiracy to Violate RICO)**
**(Against All Defendants)**

123. Farm Bureau incorporates by reference all foregoing paragraphs as if fully set forth herein.

124. Each Defendant knowingly and willfully agreed with the other Defendants and with persons known and unknown to conduct and participate in the affairs of the RICO Enterprise through the pattern of racketeering activity described above. The agreement is shown by the enterprise's hierarchy, shared compensation incentives, common training, repeated methods, coordinated claim communications, and continuing pursuit of insurance-funded work.

125. In furtherance of the conspiracy, Defendants committed and caused to be committed the overt acts described herein, including the mail and wire transmissions, false storm-date representations, manufactured roof damage, fraudulent claim submissions, fee agreements, and efforts to obtain insurance proceeds and additional funds.

126. The conspiracy was a proximate and direct cause of Farm Bureau's injury in its business and property, including the 943 Callant payment, investigative costs, and related losses.

127. Pursuant to 18 U.S.C. § 1964(c), Farm Bureau is entitled to recover threefold the damages sustained, reasonable attorneys' fees, and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants and award the following relief:

a. Treble damages under 18 U.S.C. § 1964(c) for the injuries caused by Defendants' RICO violations;

b. Compensatory damages for claim payments, property damage, investigation costs,

response costs, lost time, and all other proven business and property losses;

c. Punitive damages for Defendants' willful, wanton, reckless, fraudulent, and malicious conduct;

d. Reasonable attorneys' fees and costs under RICO;

e. Pre-judgment and post-judgment interest at the maximum lawful rate;

f. Disgorgement of all profits, fees, commissions, and other benefits Defendants derived from the scheme; and

g. Such other and further relief as the Court deems just and proper, including a jury trial on all issues so triable.

Respectfully Submitted,

TURNER PADGET GRAHAM & LANEY, P.A.

*s/Ethan L. Jedziniak*
Ethan L. Jedziniak, Fed ID.: 13926
P.O. Box 1509
Greenville, South Carolina 29602
Phone: (864) 552-4606
Facsimile: (864) 282-5970
Email: ejedziniak@turnerpadget.com
**Attorney for Plaintiff**

October 16, 2026
Greenville, South Carolina